# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| **ZELIA BROWN, AND OTHER** | § | |
| **SIMILARLY SITUATED INDIVIDUALS** | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 4:16-cv-02186** |
| | § | |
| **HOUSTON COMMUNITY COLLEGE** | § | **JURY DEMANDED** |
| **SYSTEM, CESAR MALDONADO,** | § | |
| **JANET MAY, AND THOMAS MILES** | § | |
| **ANDERSON** | § | |
| | § | |
| *Defendants*. | § | |

## PLAINTIFF'S RULE 15 AMENDED COMPLAINT,
## REQUEST FOR JURY TRIAL, AND REQUEST FOR CLASS CERTIFICATION

### TO THE HONORABLE DISTRICT COURT JUDGE AND JURY:

This suit is brought by Plaintiff, Zelia Brown, Individually and on behalf of other similarly situated black employees who after May 2016 worked or are working at Houston Community College (hereinafter either "Plaintiff," "Class" or "Plaintiff Class"), against Defendants Houston Community College ("HCC"), Cesar Maldonado in his official and individual capacities as to certain claims ("Maldonado"), Janet May in her official and individual capacities as to certain claims ("May"), and Thomas Miles Anderson in his official and individual capacities ("Anderson") for the following reasons:

## I.
## INTRODUCTION

1.      Plaintiff will show that when Defendant Cesar Maldonado was named Chancellor of HCC, he came armed with a plan.  Using his platform as chancellor, Maldonado set out to "transform" HCC by systematically and deliberately removing Black employees from positions of

authority in his administration.  To do this, he enlisted the help and cooperation of Defendants Anderson and May, who had control over HCC's talent and human resources departments.

2.      Plaintiff Zelia Brown was one of many victims of this racially motivated scheme. She was targeted, suspended, investigated, asked to admit to false accusations, and, when she refused to be complicit in her own demise, removed from the workplace.  All because of her race.

3.      This suit arises out of deliberate acts of race discrimination, as well as racially motivated policies, customs, and practices, perpetrated by Defendants against Plaintiff and the putative Plaintiff Class, that have disparately impacted all Black HCC employees.  The claims in this suit also include damages resulting from retaliatory actions taken against Plaintiff because of her race and status as a whistleblower.  Defendants collectively acted in concert with one another under color of law to cause the harm and damages alleged in this suit.  Defendants' conduct violated Title VII of the Civil Rights Act of 1964; the rights protected in 42 U.S.C. § 1981; Plaintiff's First Amendment right to petition government; Tex. Labor Code § 21.001, *et seq.* and the Texas Whistleblower Act.  Because Defendants' pervasive, systemic and widespread acts, customs and practices of race discrimination are continuing against the putative class members, Plaintiff includes a request for class certification on behalf of other Black employees who after May 2016 worked or are presently working at Houston Community College and were victims of Defendants' pervasive scheme.  Plaintiff also individually complains about retaliatory actions taken against her by the Defendants relating to her race as well as the exercise of her First Amendment right to petition government by reporting Defendants' purposeful misuse of federal grant dollars to the Federal Office of Inspector General ("OIG")—such right being enforceable under 42 U.S.C. 1983.  Defendants' retaliatory acts also violate the Texas Whistleblower Act.  *See* Tex. Gov't Code § 554.003, *et seq.*

## II.
## PARTIES

4.      Plaintiff Zelia Brown is a Texas resident who lives in Houston, Harris County, Texas.

5.      Defendant, Houston Community College ("HCC"), also referred to as the Houston Community College System ("HCCS"), is a public education institution situated in Harris County, Texas.  This defendant has appeared and filed a responsive pleading in this case; thus, no further service of process is required.

6.      Cesar Maldonado is an employee and Chancellor of HCC.  He is sued in his official and individual capacities for the deliberate actions he undertook, and which are complained about in this suit.  He is a resident of Harris County, Texas who has appeared and filed a responsive pleading in this case; thus, no further service of process is required.

7.      Janet May is an employee and head of the Human Resources Division at HCC and along with the other individual defendants coordinated, approved and directed the discriminatory plan and treatment of Plaintiff and the Plaintiff Class alleged in this case.  She is sued in her official and individual capacities.  She is a resident of Harris County, Texas, who has appeared and filed a responsive pleading in this case; thus, no further service of process is required.

8.      Thomas Miles Anderson is the Director of Talent Relations at HCC and along with the other individual defendants coordinated, approved, and directed the discriminatory plan and treatment of Plaintiff and the Plaintiff Class alleged in this case.  He is sued in his official and individual capacities.  He is a resident of Fort Bend County and may be served with process at 11327 Memsie Ct, Richmond, TX 77407, or wherever he may be found.

## III.
## JURISDICTION, VENUE, AND WAIVER OF IMMUNITY

9.      This Court has federal-question jurisdiction over Plaintiff's alleged violations of federal-discrimination laws (Title VII, 42 U.S.C. §§ 1981, 1983) pursuant to 28 U.S.C. § 1331.  It has jurisdiction over Plaintiff's state-law claims arising from the same operative facts as Plaintiff's federal-law claims pursuant to 28 U.S.C. § 1367.  Moreover, federal jurisdiction is appropriate over Plaintiff's class allegations pursuant to the Class Action Fairness Act.  *See* 28 U.S.C. § 1332(d).

10.      The conduct complained of in this suit concerns a general policy of conscious race discrimination, retaliation, harassment, and disparate treatment of Black employees like Plaintiff in violation of 42 U.S.C. § 1983, which provides a cause of action and waiver of immunity.  Such conduct deprives the individual defendants of official immunity since the conduct was deliberate, willful, and clearly unlawful at the time.  Title VII also creates a cause of action and provides a waiver of immunity.  Because HCC is an "employer" under that Act and accepts federal funding,[1] HCC expressly agreed to waive its sovereign immunity as to the type of discrimination and retaliation claims Plaintiff asserts in this case.  *See Gruver v. La. Bd. of Supervisors for the La. State Univ. Agric. & Mech. Coll.*, 959 F.3d 178 (5th Cir. 2020) (governmental entity accepting federal funds held to have expressly waived its sovereign immunity as to discrimination claims).  Nor does sovereign immunity attach to Plaintiff's claimed abridgment of her First Amendment right to petition government by Defendants acting under color of state law, which is also actionable under 42 U.S.C. § 1983.  Plaintiff's state-law claims pursuant to the Texas Whistleblower Act, *see* Tex. Gov't Code § 554.003, et seq., and the Texas Commission on Human Rights Act, Tex. Lab. Code § 21.254, also waive Defendants' immunity from suit and liability.

---

[1] *See* Exhibit 1: Pages from HCC's 2019 Fund Report showing its receipt and acceptance of federal funds.

11.    Venue is proper in the Southern District of Texas because the events complained about in this case substantially occurred in that county and within this District and, specifically, the Houston Division.  Additionally, one or more of the Defendants sued in this case resides in this county and District.  Finally, Plaintiff has satisfied all conditions precedent to bring the claims asserted in this case, including exhaustion of pre-trial administrative opportunities to resolve this dispute.[2]

## IV.
## BACKGROUND

12.    Plaintiff is the victim of a well-developed, systematic, entrenched, and wildly successful campaign of deliberate race and sex discrimination against Black employees in leadership at HCC.  This "campaign" led by Defendant Maldonado, and implemented by Defendants Anderson and May, as the respective Director of Talent Relations and Human Resources Division Chief at HCC, (collectively, the "Administration"), are carried out with great efficiency and has resulted in the dismissal, demotion, and termination of Black employees at alarming and disproportionate rates.  Maldonado targets the Black executives to be removed or demoted, then Anderson and May are in charge of "investigating" those employees—which investigations manufacture objectively false claims against the employees resulting in their ultimate dismissal or termination.  Anderson has to authorize each of these false reports and approve them even when the investigation is plainly false.  May then carries out the displacement of the Black employees by either placing them on "leave of absence," transforming the employee to a lesser position, filling the vacancies with less qualified Hispanic or White candidates, and /or

---

[2] *See* Exhibit 2, Plaintiff's Request to Appeal employment actions to the HCC Board of Trustees advising them of her whistleblower claim, dated April 14, 2020; Exhibit 3, Statement of Zelia Brown read and provided to the HCC Board of Trustees during her appeal, dated June 3, 2020; Exhibit 4, Acknowledgement of Zelia's Brown's request to speak to the HCC Board of Trustees, dated June 2, 2020; Exhibit 5, Acknowledgement of Zelia Brown's appearance before the HCC Board of Trustees, dated June 10, 2020, and Exhibit 6, the June 18, 2020 EEOC Right to Sue letter.

ultimately terminating the Black employee.  Maldonado targets the Black employees for removal and Anderson and May carry out his racially motivated scheme to remove the Black employees. This "Displacement Plan" typically involves some, if not all, of the following steps:

- target a top-level Black employee for firing or removal;

- allege a *false, exaggerated or untrue* narrative about the Black employee, claiming that the Black employee violated some rule or policy;

- launch a slanderous "investigation" into that false allegation;

- use the charade investigation as pretext to place the Black employee on administration leave or reassignment, which also serves to confirm the false narrative;

- as part of the investigation, confront the Black employee with a trumped-up charge calculated to justify the initial investigation and pad the employee's personnel file with a false narrative;

- if the Black employee refuses to acquiesce to the charge or otherwise tries to expose the injustice (for example, by filing an EEOC claim or whistleblowing), the administrative leave is extended, ultimately leading to demotion or forced discharge.

13.     The Displacement Plan has been so flagrant and deliberate at HCC it has resulted in the displacement of 90% of the Black executives/professionals, while only 10% of comparable White professionals have been displaced over the last six years—i.e., since Maldonado's arrival as chancellor.  Additionally, while Blacks have been displaced, there has been a 50% increase in Hispanic hires and promotions.  Plaintiff was an intended victim of such racial discrimination.

14.     White and Hispanic employees are not systematically treated in such a manner. Indeed, their transgressions are routinely ignored and go unpunished while Black employees are

sent home, placed on leave of absence, placed under "investigation" and variously demeaned in the workplace under the Displacement Plan.

15.    In less than six years at the helm of HCC, the Administration has succeeded in firing and/or removing all but a few top-level Black employees from their positions.  Many of the Black employees so fired and/or removed had held their positions for decades while compiling exemplary work histories at HCC.  These Black executives have been disproportionately replaced by less qualified Hispanic and White hires.

## A.    The Administration's "Hispanic Preference" Agenda

16.    The massive displacement of Blacks at HCC since Maldonado's arrival is not accidental.  Nor is the displacement of Blacks merely *de facto* discrimination (although it certainly is)—it was very much premeditated, and the general practice was documented in emails.

17.    Maldonado was appointed Chancellor of HCC in May 2014.  He is Hispanic.  He immediately set HCC in a dramatic new direction.  Within a month of Maldonado being confirmed as the new Chancellor, Dr. Ricardo Solis, a Hispanic HCC Director at the time, explained that Maldonado, as Chancellor, would adopt policies and take actions at HCC to provide *preferential treatment for Hispanics*.  On an April 21-24, 2014 email string, Solis wrote to Maldonado congratulating him on his appointment.  Solis said that he could provide the new Chancellor with "the pulse of the [HCC] system" and invited him to have dinner soon.  Within days of that first email Solis wrote another Hispanic colleague at HCC the following prescient email reflecting Maldonado's race agenda: "Now WE [Hispanics] will finally get *preferential treatment*."[3]  The email string shows that Solis, as an HCC director and Maldonado confidant, concluded from his

---

[3] *See* Exhibit 7.  One of the recipients of these emails will testify that they personally observed intentional discriminatory decisions being made to hire less-qualified White and Hispanic applicants over more qualified Black candidates.  There is also evidence that new HCC positions were promised to Hispanic or White hires before Black employees were even notified that the positions were being posted or available for the Black employee to apply.

close interactions with Maldonado that HCC would soon begin showing "*preferential treatment*" to Hispanics over other races.

18.     Solis's emails could be dismissed as the wishful thoughts of Maldonado's personal friend except that, as an HCC director at the time, it indicates the extent and forethought dedicated to the general policy that led to the Displacement Plan, as well as the widespread knowledge of the scheme.  Moreover, Solis's prediction has subsequently been proven true on the objective record.  While Black executives in leadership roles have been uniformly removed from their positions, less-trained and less-experienced Hispanics and Whites have flooded to replace them. The events of the past six years only make sense when understood in the context of this scheme of race discrimination and retaliation.

**B.     The "Displacement Plan" to Discriminate Against Black Employees**

19.     HCC's board of trustees in practice have delegated to Defendant Maldonado, who in turn has admittedly assigned, delegated to and acted in concert with Defendants May and Anderson, the right and authority to hire, investigate, discipline and terminate HCC employees. Accordingly, these three individual Defendants were the final decision makers with respect to the employment policies and practices of HCC challenged in this suit.  The Administration moved quickly to implement Maldonado's agenda.

20.     This common practice described above yields one of three common outcomes:  (1) the Black employee relents to the false charge, which then becomes a demerit in his or her personnel file, justifies a demotion, and becomes ammunition for additional adverse employment actions in the future; (2) the investigations, administrative leave, and harassment continues until the Black employee has no choice but to resign; or (3) if the Black employee resists this incredible pressure, he or she is explicitly terminated or demoted.

21.    As part of this common practice, Anderson and May sign off on the alleged "investigations" of Black employees and finally "approve" those investigations even when they are knowingly false and exaggerated.  Indeed, Anderson and May have routinely and customarily signed off on or implemented harsher punishments for Black employees than White and Hispanic employees performing the same or more egregious policy and legal transgressions.

22.    Placing an employee on forced "leave of absence" is the Administration's way of placing the employee under a cloud of suspicion and suggests they have engaged in a major act of wrongdoing.  Since Maldonado's arrival, nearly 95% of the time when a Black person is given a forced "leave of absence" they are ultimately terminated or demoted.

23.    Even more distressing is the fact that Defendants Anderson and May have, on information and belief, changed and added *undated* policy changes which can later be used as a basis to dismiss or punish the Black employees.  Such policy changes would make it difficult or impossible for employees to know what and when such changes became enforceable or were approved.  Such a practice is contrary to accepted and approve Human Resources practices.

24.    This pervasive pattern of false or exaggerated allegations, followed by slanderous investigation, does not plague the White and Hispanic employees at HCC like it does Black employees.  And even when White and Hispanic employees actually violate more serious policies and rules, they often go uninvestigated or unpunished, with the violator at most being given a slap on the wrist. Black employees are not given a real or fair opportunity to respond to complaints or allegations against them before being punished.

25.    By April 13, 2015, Maldonado had adopted the term "transformation" to describe his Displacement Plan.  The Administration pretends that its displacement of Blacks is merely undertaken as a part of "transforming" HCC to a better educational environment.  And in a literal

sense, they are in fact "transforming" HCC—it is becoming whiter and more Hispanic at the price of Black employees. When Black executives are removed, their vacancies are disproportionately filled by less qualified Hispanic and White employees.

26. There is evidence that the term "transformation" was an afterthought to cover the true plan of getting rid of Black employees. On information and belief, Maldonado eschewed the phrase "reduction in force" (RIF) because such an approach in removing employees would be expected to proceed on a "last in-first out" or "point score calculation" method which would easily compare employees based on tenure and/or merit. However, such neutral systems would not easily accommodate the goal of racial replacement of the seasoned Black executives. Instead, Maldonado decided upon a "transformation" scheme which more easily accommodated his goal of removing Black employees in favor of hiring more Whites and Hispanics.

27. The Displacement Plan flows from Maldonado at the top, down through Anderson and May. Anderson, as Director of Talent Relations, is charged with approving all employee "investigations," signing off on the results of those investigations, changing the scope of the investigations, and working with May to ensure that the desired outcome is carried out with each employee. May, as the leader of the Human Resources Division, manages and implements the component parts of the Displacement Plan and makes the decisions regarding the displacement of employees.

28. In a separate racial discrimination lawsuit filed by another former Black executive against HCC (it should not be surprising that this is not the first discrimination allegation against the Administration), Maldonado confirmed under oath that he relies on and accepts the recommendations of Anderson and May in terminating and demoting employees. *See*

Maldonado's deposition testimony in Cause No. 2015-77438, *Dr. Sabrina Lewis v. Houston Community College*, pending in the 269th District Court, Harris County, TX.

### C. Disparate Treatment and Impact on Black Employees

29.    The evidence of the Displacement Plan's success is readily apparent. The following are but a few actual instances of the discrimination against and disparate treatment of Black employees:

- 45+ year employed top-level Black female, with decades of exemplary work at HCC, passed over for a promotion for which she was the most qualified candidate and the position given to a less-qualified 30-year old Hispanic female.

- 20+ year employed Black female employee, with exemplary work history, targeted for removal by The Administration and forced out of her position when her duties were "transformed" and given to a non-Black employee.

- 25+ year employed Black female employee demoted, and ultimately forced out of her position without cause, when her job functions were "transformed" to non-Black employees.

- 20+ year employed Black female working in a supervisory position, with exemplary work history, assaulted by a White female employee in the workplace, then targeted for removal by The Administration. The White female who was the wrongdoer was allowed to remain employed—the innocent Black female supervisor who did not assault the White employee was fired.

- 20+ year employed Black female targeted for removal by The Administration and forced out based on a manufactured false claim.

- 22+ year employed Black female, with exemplary work history, targeted for removal by The Administration and forced out of her position under HCC's "transformation" plan.

- 41+ year employed Black female passed over for promotion to an Executive Director position for which she was the best qualified. A White male was given the position.

- Black female with 7 years' experience working at HCC targeted for removal by The Administration and forced out after observing unethical purchasing practices by her Hispanic Purchasing Department Director without any corrective action being taken by The Administration against the Hispanic employee. Only the Black female who complained was displaced.

- 42+ year employed Black female at HCC, and creator of the most successful online enrollment program at the college, targeted for removal by The Administration and was removed from her presidency at the HCC-NW campus and replaced by a non-Black hire.

- 38+ year employed Black female at HCC targeted for removal by The Administration and forced out and replaced by a non-Black employee.

- Black female with 8 years of employment at HCC targeted for removal by The Administration and forced out and replaced by a non-Black hire.

- 20+ year employed Black female at HCC targeted for removal by The Administration and demoted to a low-level position.

- 23+ year employed Black female at HCC targeted for removal by The Administration and fired for reporting a terroristic threat by a White female co-worker in the workplace. The report was made to the HCC police department. The Black female was fired for *reporting* the White female's threats to the HCC police department while the White female was allowed to remain employed.

- 25+ year employed Black female at HCC filed a sexual harassment claim with HCC against her White supervisor. She was investigated and made to remain under the management and supervision of the White male offender. No known corrective or disciplinary action has been undertaken against the White supervisor.

- 11+ year employed Black male corrected a White female vendor who was being disrespectful to subordinates in his department. The White female lodged a false claim of sexual harassment against the Black male. The Administration's investigator, on information and belief, told the Black male that he found the White female's word more credible even though there were multiple witnesses corroborating the Black male's side of the story and no credible corroborating witnesses for the White female's story.

- Plaintiff, a Black female, after 4+ years of exemplary work at HCC, was targeted for removal by The Administration and removed from campus, placed on mandatory leave of absence, required to admit to a false claim that she created a hostile work environment if she wanted to keep her job, retaliated against for reporting HCC's misuse and suspected theft of grant funds, and ultimately replaced by an unqualified Hispanic male.[4]

These are some, but by no means all, of the instances of the systematic mistreatment of and

discrimination against Black employees by the Administration.

---

[4] The Hispanic male who replaced Plaintiff had *zero* experience or training in grant compliance even though HCC's job description for the position required multiple years of actual experience in grant management and grant compliance. Plaintiff was qualified for the position—the Hispanic male was not. *See* Exhibit 8.

30.    In isolation, or in any individual case, the discriminatory intent behind the Displacement Plan might be difficult to decipher.  However, when viewed over years of implementation, the commonality of the discriminatory scheme comes into clear view.  There is both objective data—such as that 90% of the Black executives have been deemed unfit while 90% of White executives continued their careers unimpeded or that Hispanics have been hired at abnormally high rates to displace the Black employees—and plenty of actual cases, such as those laid out above, that demonstrate the existence of a consistent scheme of disparate treatment based on race.

### D.    Plaintiff Falls Victim to the Displacement Plan

31.    Defendants' actions toward Plaintiff are correctly viewed against the backdrop of their history of deliberate and purposeful discriminatory policies, customs and practices outlined above.  Against this backdrop, it is clear that Ms. Brown was just another in a long line of the Displacement Plan's victims.

32.    Plaintiff is a 55-year old Black female who was hired at HCC in February 2016. She served as the Manager of the Grants Performance and Compliance Department.  She had over a decade of training and experience in grant compliance and was well-qualified for her job.  In her position, she and her direct subordinates were responsible for implementing grant management and compliance initiatives to provide technical assistance and guidance concerning the receipt and use of state and federal grant funds received by HCC.[5]  Grant funding is typically identified in HCC's budget as "restricted funds"—meaning that HCC was fully aware that such monies were only permissibly used for specified purposes set forth in the grant documents.  Any unauthorized use of the grant funds was considered theft and a misuse of grant dollars.

---

[5] *See* Exhibit 8, Plaintiff's grant compliance job description.

33.    After years of consistent, exemplary job performance, Plaintiff observed and pointed out that HCC officials were not using restricted grant funds as required by law or consistent with grant documents.  Indeed, some grant funds were simply not being accounted for at all and/or were being used in unlawful and improper private profiteering schemes.  Plaintiff called these discrepancies to the attention of HCC's management, including her supervisor and indirectly to Anderson and May.  She pointed out that such conduct not only violated the grant documents but appeared to be illegal.

34.    One specific instance of wrongdoing that Plaintiff observed occurred at the hands of one of the present HCC trustees, Adriana Tamez.  Tamez is a Hispanic female.  Plaintiff discovered that Tamez was "stockpiling"[6] grant benefits on the eve of a grant's expiration in violation of grant guidelines, which Plaintiff reported up the chain of command.  Tamez was the President of the Raul Yzaguirre Schools for Success but now sits as one of the members of the Board of Trustees.  Tamez did not recuse herself from considering Plaintiff's appeal.

35.    While Plaintiff pointed out the misuse of grant funds, other White and Hispanic grant compliance personnel were equally aware of and confirmed the same or similar grant irregularities.  Indeed, even though Plaintiff's entire grant compliance team participated in making management aware of Tamez's misuse of grant funds, Plaintiff, the only Black female on the team, was singled out and targeted for retaliation.  None of her White or Hispanic colleagues were ever targeted or investigated.

---

[6] "Stockpiling" is the prohibited practice of not using grant funds or assets over the scheduled timeframe provided for in the grant documents to achieve maximum intended benefits.  Rather, those who stockpile hold off and wait until near the end of the specified grant period to stockpile supplies, goods, services, and grant benefits that they can then use after the grant period expires for whatever purpose they wish since the grant period would no longer be controlling.  As such, a "stockpiler" can frustrate the purpose of a grant all together by waiting until it is too late for the grantor to complain.

36.    In addition to pointing out Tamez's improper grant stockpiling, Plaintiff and her team also asked about other missing and misused federal grant dollars. Plaintiff observed that another HCC official was charging and collecting a private fee from people who were attending an event paid for completely by federal grant dollars. Private profiteering from the use of grant funds is illegal and improper.

37.    Plaintiff also pointed out the misuse of over a half million dollars of federal grant funds by Maldonado and HCC. Those monies were expressly reserved for use to help minority businesses adversely impacted by Hurricane Harvey to recover. Instead of using the funds for that purpose, HCC used a portion of the funds to host a training meeting where half of the attendees were HCC employees—not minority business owners. Additionally, another $475,000 of those grant dollars have gone missing.

38.    Plaintiff raised these concerns to her direct supervisor, Maya Durnovo, and indirectly to Maldonado, Anderson, and May. None of them supplied any satisfactory answers to explain the misused and missing grant dollars. The only effect of Plaintiff's dutiful reporting was to bring her into the Administration's crosshairs as a target for investigation and ultimate removal.

39.    Soon after she began reporting these inconsistencies, Plaintiff and the only other Black in her grant compliance group suffered the adverse employment action of having her job duties reduced. Both Black employees were immediately and systematically excluded and not invited to grant meetings where grant funding was discussed. Attendance at these meetings was a customary and normal part of Plaintiff's grant compliance duties. Being excluded from these meeting was effectively a demotion, as well as a reduction in Plaintiff's job responsibilities since her job functions explicitly required her participation in these types of meetings.

40.    Plaintiff complained to her supervisor that the Black employees responsible for grant compliance were being excluded from the meetings.  Rather than having her complaints acknowledged and investigated, the Administration launched an investigation into her performance as a grant watchdog.

41.    True to the Displacement Plan's playbook, Plaintiff suffered the indignity of being placed on administrative leave and told to immediately leave HCC's campus.  No White or Hispanic member of her team received a similar instruction.   Plaintiff was also told not to come back to the campus until she was approved to do so by management.  Thus, after being relegated to the sidelines of the grant meetings, she was ultimately labelled a troublemaker and required to vacate the premises or suffer removal by force.

42.    Plaintiff has learned that HCC's policy and practice of placing an employee on leave of absence is only undertaken when the employee is targeted for termination.  And, to be placed on leave of absence at HCC is the Administration's method of placing the employee under a cloud of suspicion to justify further detrimental employment actions.[7]

43.    When Plaintiff was placed on administrative leave, the Administration replaced her with a clearly unqualified Hispanic male who admitted he had no grant compliance experience, Miguel San Juan.  This too was in line with the Displacement Plan's preference for giving less-qualified Hispanics and Whites the jobs previously held by displaced Black employees.

44.    While Plaintiff was out on mandatory administrative leave, the Administration continued its investigation against Plaintiff. As with other Black employees in leadership positions under the Administration's reign, Anderson and May created and approved a false narrative that

---

[7] *See* Exhibit 9, the Leave of Absence letter from May to Plaintiff.

Plaintiff had created some unspecified, and untrue, hostile work environment that needed to be investigated.

45.    As part of their investigation, and while Plaintiff was exiled from her workplace and the HCC's campus, the Administration had Plaintiff's grant-compliance office unlocked and invaded by two White employees who rummaged around the office for over two hours—no doubt attempting to find, remove, and/or destroy records relating to HCC's misuse of grant dollars.  It is presently unknown what, if any, documents and/or records were removed, destroyed or altered since Plaintiff has not been back on campus or to her office.  However, the fact that these invaders had a key to open her office suggests they had to have been management level or higher personnel since Plaintiff was a manager-level employee with the authority to lock her office when it was not in use.

46.    Despite this harassing investigation, the Administration never produced to Plaintiff a shred of evidence to support their hostile-work-environment charge against Plaintiff.

47.    That lack of evidence, however, did not stop the Administration from putting its false claim into writing, as approved by May and Anderson, and delivered to Plaintiff while she was on leave of absence.  With Anderson and May's approval, a written letter was sent to Plaintiff asserting she had created a hostile work environment and she would only be allowed back on campus if she agreed not to create a hostile work environment.  Such a charge against Plaintiff was purely an act of fiction and pretextual to ultimately serve as justification for her termination. A copy of that false claim was also placed in her personnel file.

48.    Next, Plaintiff was offered a conditional return to work if she would admit to the false claim of creating a hostile workplace.  Consistent with the Administration's Displacement Plan of targeting Black executives for firing, this false charge was clearly purposed to serve as

justification for Plaintiff's termination later. Plaintiff did not immediately sign the false claim, and her administrative leave continued.

49.    While she was on mandatory leave, Plaintiff blew the whistle on Defendants' mishandling of federal grant dollars and notified the Federal Office of Inspector General ("OIG") about what was occurring at HCC.[8]

50.    Plaintiff reported the misappropriation of federal grant funds to OIG before formally rejecting the Administration's conditional offer to self-incriminate in exchange for her job back.  The very day that OIG notified HCC's administration that it was going to investigate, even the prior coercive offer was immediately withdrawn.[9]   At Anderson's direction, Tara Bond, one of his subordinates in Talent Relations, sent an email to Plaintiff withdrawing the prior conditional offer for Plaintiff to return to work.   Plaintiff was again told not to return to work, and her administrative leave was extended.  As such, Plaintiff suffered a further adverse employment action when even the prior improper offer for her to return to work was withdrawn after Defendants learned she had blown the whistle to the OIG.

51.    This was not the first time Plaintiff had seen this story unfold.  During Maldonado's reign, another Black female employee serving as a budget analyst in another department, Pandora Jubilee, had suffered adverse employment actions for reporting HCC's misuse of grant dollars at Coleman College for Health Sciences, a part of the Houston Community College System.  The Administration was using those grant dollars to pay employee salaries instead of using the grant funds for the purposes prescribed in the grant documents.  Ms. Jubilee pointed the finger at a White superior, which, predictably, put her on the Administration's radar.

[8] *See* Exhibit 9, Plaintiff's notice to the OIG.
[9] *See* Exhibit 10, OIG's notice of investigation.

52.     The Administration ignored Jubilee's misappropriation allegation and refused to investigate the White employee's misuse of funds.  Instead, Jubilee soon became the focus of an "investigation," and ultimately resigned due to intolerable work conditions at HCC.[10]

53.     With this memory fresh in her mind, Plaintiff saw the writing on the wall.  Knowing that Defendants were deliberately discriminating against her because of her race, were likely retaliating against her for reporting their wrongdoing to the OIG, and having seen the racial playbook of Defendants padding her personnel file with false claims,[11] Plaintiff knew she could not return to work because the harassment would not end there.  Accordingly, Plaintiff resigned her position, reasonably concluding she had been constructively discharged.

54.     Unsurprisingly and predictably, Plaintiff's job vacancy was filled by Miguel San Juan, an objectively and admittedly unqualified Hispanic male.[12]

55.     Plaintiff requested an appeal to the HCC Board of Trustees to reverse the actions of Maldonado, Anderson and May.  Her written request for an appeal occurred at a time of mounting fears and demonstrated horrors in Houston associated with the COVID-19 pandemic. Plaintiff sent a letter asking for an opportunity to appeal the adverse employment actions taken against her to the HCC Board of Trustees.[13]  In response, and surprisingly, an HCC lawyer wrote back rejecting Plaintiff's appeal to the Board.  The letter claimed that Plaintiff would not be allowed to present her appeal because the request was made too late—even though it was clearly known that COVID-19 had delayed and was delaying all normal business timelines and deadlines

---

[10] Importantly, Jubilee participated in a meeting where HCC's misuse of grant funds was discussed.  Defendant Anderson was present in the meeting when Jubilee told everyone present that HCC's use of grant funds to pay employee salaries was illegal.  Anderson participated in and authorized Jubilee's subsequent investigation.

[11] *See* Exhibit 2, letter from Plaintiff's counsel to HCC refusing to participate in the "padding" of her file.

[12] *See* Footnote 4, *supra.*

[13] *See* Exhibit 2.

at the time.  Not to be deterred from her request to appeal to the HCC Board, Plaintiff then requested an opportunity to appear before the Board, as a citizen, to urge her appeal.

56.    Plaintiff intended to make her appeal in public session at the next HCC Board meeting.  She also was prepared to provide copies of her written statement and appeal outlining matters for the Board's consideration and to request that the Board reverse and remedy the wrongful actions taken against her.  *See* Exhibit 3.  Plaintiff's request to appear before the Board was not initially acknowledged.  However, at the last minute, Plaintiff received a notice from counsel for the Board stating that Plaintiff's matter would not be heard in public session but rather would be considered a "personnel matter" and heard by the Board in closed session.[14]

57.    Calling Plaintiff's request a "personnel matter" was in direct contradiction to the earlier claim by HCC's counsel claiming that her appeal was too late.   However, by treating Plaintiff's appeal as a "personnel matter" and requiring it to be considered in closed session, both the Plaintiff and Board have had an opportunity to try to resolve this dispute informally prior to litigation.

58.    The closed session appeal occurred, but no Board member asked a single question. Afterward, the Board's attorney sent Plaintiff an e-mail thanking her for appearing because the Board "appreciates hearing from members of the public."  *See* Exhibit 5 (Letter from the Board's counsel).

59.    The HCC Board of Trustees has done nothing with the appeal to address Plaintiff's complaints or to reverse what occurred.  Thus, Plaintiff has exhausted her administrative options at HCC.  *See Fort Bend Indep. Sch. Dist. v. Gayle*, 371 S.W.3d 391, 393 (Tex. App.—Houston [1st Dist.] 2012, pet. denied), *Hitchcock Indep. Sch. Dist. v. Walker*, No. 01-10-00669-CV, 2010

---

[14] *See* Exhibit 4, Email from HCC counsel advising Plaintiff of the Board's closed session.

Tex. App. LEXIS 9941, at *16 (Tex. App.—Houston [1st Dist.] Dec. 16, 2010) (holding that reasonable efforts to resolve matters before litigation satisfy the Texas Whistleblower Act predicate requirements).

60.     Plaintiff also has obtained her right to sue letter from the EEOC after failing to resolve matters with Defendants.  Plaintiff is without employment, not because she did anything wrong, but because she was a top-level Black female at HCC who dared to challenge racial discrimination and to do her job. She also was retaliated against for the same reasons and for blowing the whistle to the OIG.

61.     To date, Defendants have not offered or substantiated any non-discriminatory or non-retaliatory reason to force Plaintiff out of meetings that clearly fell within her job description or exile her from the HCC campus.  There was no non-discriminatory reason to put Plaintiff on leave of absence after she complained about Defendants' racially discriminatory practices.  There was no non-discriminatory reason to create a lie about Plaintiff that she had created a hostile work environment as a pretext to pad her personnel file and search through her office.  And, there was no non-discriminatory reason to tell Plaintiff not to return to work after she lawfully petitioned the OIG about unlawful misuse of federal grant dollars by Defendants.  Simply put, Defendants were playing from the same racially motivated playbook they had successfully used against other Black HCC employees in leadership positions.  Plaintiff refused to be yet another silent victim of the Displacement Plan and files this suit seeking damages, compensatory and punitive, and injunctive relief.

### E.     "Blocked or Asleep at The Controls"

62.     As set forth above, Plaintiff appealed the clearly retaliatory, discriminatory, and racially offensive conduct of Maldonado, Anderson, and May to the HCC Board of Trustees—one of whose members is Tamez.  HCC's policies expressly authorized such appeals to the Board. The

Board has chosen not to address or correct what happened. And, with clear knowledge of Plaintiff's appeal, the Board has chosen not to correct the wrong. As such, the Board has knowingly ratified the offensive and discriminatory conduct alleged in this case, including the systemic pattern, practice, policies, and custom of the Displacement Plan. Additionally, the Board has delegated to Maldonado, Anderson, and May the final decision-making authority relating to the firings, displacements, retaliations, and race discrimination against Black employees as alleged in this case.

**V.**
**CLASS ACTION ALLEGATIONS**

63.    Plaintiff also seeks to represent the following Class of individuals: all Black Americans who were or continue to be employed by HCC from January 1, 2016 through the filing date of the original petition in this litigation who have had an adverse employment action imposed upon them by HCC in violation of Section 1981[15] and/or Title VII of the Civil Rights Act 1964.

64.    Excluded from the Class are Defendants and their officers, directors, and trustees, as well as the Court and its personnel working directly on this case.

65.    Plaintiff and all others similarly situated are entitled to have this case maintained as a class action pursuant to the Federal Rules of Civil Procedure for the following reasons:

a.    The prerequisites for a class action under Federal Rule of Civil Procedure 23(a) are met. The Class is so numerous that joinder of all persons is impracticable. As many as 100+ Black

---

[15] The term "adverse employment action" includes termination of employment or discharge (whether express or constructive), demotion, reduction in salary, involuntary administrative leave (whether paid or unpaid), unwarranted administrative investigations, reduction in job responsibilities, reassignment to menial or degrading work, reassignment to work under a younger or less experienced supervisor, badgering, harassment, or humiliation by the employer reasonably calculated to encourage the employee's resignation, offers of early retirement (or continued employment) on terms less favorable than the employee's former status, or any other action constituting a hostile work environment.

employees were adversely affected by Defendants' discriminatory conduct based on race. The number of Class Members may be better estimated as the litigation progresses.

b.    There are common issues of law and fact, including, but not limited to: (1) whether Defendants created a deliberate general policy for targeting, demoting and discharging Black employees; (2) whether Defendants engaged in a general policy, pattern and practice of replacing Black employees with less qualified Hispanic or White employees; (3) whether these actions were the result of a *de facto* policy of racial discrimination; and (4) whether Defendants are liable for damages to the Class for discriminatory conduct based on race in violation of Section 1981. These and other common issues of law and fact relate to and affect the rights of Plaintiff and the Plaintiff Class Members. Because these issues relate to Defendants' high-level, general policy and practice towards employment decisions, they are capable of resolution through common evidence. Plaintiff's common proof of Defendants' liability will involve the same cast of characters, the same Defendants, the same events, discovery, documents, fact witnesses, and experts.

c.    Plaintiff's claims are typical of the Class. Plaintiff was a victim of the Displacement Plan outlined above. Like other class members, she was targeted, investigated, exposed to objectively false allegations, harassed, and ultimately suffered multiple adverse employment actions based on her race. She suffered emotional harm and economic injury that are typical of the Class Members. Her interests are identical to and aligned with those of other Class Members. Plaintiff and the Class Members have suffered an array of recoverable damages all stemming from the common trunk of facts and issues related to the racially discriminatory policies, practices, and customs at HCC. Those damages will be further detailed as the case progresses, to include, but not limited to, front pay, back pay, compensatory damages, and punitive damages.

66.    Plaintiff will fairly and adequately represent and protect the interests of the Class because:

a.    Plaintiff has retained seasoned counsel experienced in the prosecution of class action litigation who will adequately represent the interests of the Class;

b.    Plaintiff and her counsel are aware of no conflicts of interest between Plaintiff and putative Class Members or otherwise that cannot be managed through implementation of available procedures;

c.    Plaintiff, through her counsel, has adequate financial resources to assure that the interests of the Class will be protected; and

d.    Plaintiff is knowledgeable concerning the subject matter of this action and will assist counsel in the prosecution of this case.

67.    Further, a class action may be maintained under Federal Rule of Civil Procedure 23(b)(2) because the parties opposing the Class are the same and have acted and/or refused to act on grounds that apply generally to the Class, so that final injunctive relief is appropriate respecting the Class as a whole.

68.    A class action may also be maintained under Federal Rule of Civil Procedure 23(b)(3) because common issues of law and fact predominate over those issues that might pertain to individual cases.  The predominant issue in this case is whether Defendants acted pursuant to a discriminatory general pattern and practice of targeting Black employees and replacing them with Hispanic and White employees.  The interests of all members of the Class in establishing the liability of Defendants for discriminatory conduct based on race are cohesive.

69.    The need for proof of Plaintiff's and Class Members' damages will not cause individual issues to predominate over common questions.  Damages consistent with each of the

categories of claims can be efficiently demonstrated either at trial or as part of routine claims administration through accepted and court-approved methodologies with the assistance of court-appointed personnel, including Special Masters. Certain types and elements of damage are subject to proof using aggregate damage methodologies or simply rote calculation and summation.

70.      A class action is superior to maintenance of these claims on a claim-by-claim basis when all actions arise out of the conduct of the same defendants, and under the same circumstances, policies, course of conduct, pattern, and practices. Class litigation is manageable considering the opportunity to afford reasonable notice of significant phases of the litigation to Class Members, manage recovery and permit distribution of any recovery. A class action also allows the Court to process all rightful claims in one proceeding. It is impracticable and risks conflicting judgments to force more than 100 Class Members to litigate claims individually, with each Plaintiff conducting duplicative discovery and ultimately having to prove the existence of the Displacement Plan in each case. The prosecution of separate actions by individual Class Members, or the individual joinder of all Class Members in this action, is impracticable and could result in inconsistent adjudications, while a single class action can determine, with judicial economy, the rights of each member of the Class, should that be determined to be appropriate.

71.      The conduct of this action as a class action conserves the resources of the parties and the court system, protects the rights of each member of the Class, and meets all due process requirements.

72.      Certification of the Class with respect to particular common factual and legal issues concerning liability and affirmative defenses, as well as the necessary and appropriate quantum of punitive damages, or ratio of punitive damages to actual harm, is also appropriate under Federal Rule of Civil Procedure 23(c)(4).

**VI.**
**CAUSES OF ACTION**

73.    Plaintiff re-urges by reference all of the allegations contained above and asserts

the following causes of actions against each of the Defendants named in this suit as specified

below:

**VIOLATION OF 42 U.S.C. § 1981 AND 42 U.S.C. § 1983**

74.    This claim is brought on behalf of Plaintiff in her individual capacity and as a

representative of the Plaintiff Class.

75.    The Defendants intentionally engaged in the aforementioned practices, policies,

customs, and actions which are unlawful under 42 U.S.C. § 1981 and actionable under 42 U.S.C.

§ 1983.

76.    Plaintiff is (1) a member of a recognized racial minority, (2) there was an intent to

discriminate against her and the Plaintiff Class on the basis of her/their race by the Defendants;

and (3) the alleged discrimination concerns one or more of the activities enumerated in § 1981.

77.    Defendants have engaged in a system and custom of policies, practices, and pattern

of conduct under color of law that has damaged Plaintiff and the Plaintiff Class with discriminatory

and retaliatory intent.    As a part of this scheme, Defendants regularly create pretextual

justifications for their specific actions.    This scheme both constitutes disparate treatment and

creates a disparate impact on members of the Plaintiff Class.

78.    Plaintiff was retaliated against in violation of § 1981 as enforced under 42 U.S.C.

§ 1983.  Defendants' retaliation against Plaintiff was part of a broad custom, policy, pattern, and

practice of retaliation against Black employees.  Specifically, Plaintiff engaged in a protected

activity by complaining about the exclusion of Blacks from grant meetings, and in complaining

about the systematic targeting and investigation of Black employees.  The Defendants acted

adversely against Plaintiff under color of law, and the adverse action was taken because of Plaintiff's protected activity. A reasonable employee would have found the challenged action materially adverse and the challenged action would have dissuaded a reasonable worker from engaging in the protected activity.

79.     As a result of her protected status and actions under 42 U.S.C. § 1981, Plaintiff suffered an adverse employment action, including but not limited to being investigated, harassed, and, ultimately, constructively discharged from her employment. The working conditions were so intolerable and hostile that Plaintiff could not reasonably be expected to endure the working environment and situation, thereby forcing her to resign. Plaintiff seeks damages exceeding $1,000,000.00 and the Class Members each having compensatory and punitive damage claims exceeding $10,000,000.00

## TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

80.     This claim is brought on behalf of Plaintiff in her individual capacity and as a representative of the Plaintiff Class.

81.     Defendant HCC is an employer as defined in 42 U.S.C. § 2000e (b) of Title VII. At all times material to the claims asserted herein, this Defendant employed more than 500 employees. Defendant was aware that Plaintiff was a member of a protected racial class.[16]

82.     Plaintiff has timely and fully complied with prerequisites for administrative exhaustion required under Title VII. Thus, all conditions precedent to bring this cause of action have been performed or have otherwise been satisfied.[17]

---

[16] Plaintiff notes that 70% of the casualties of the Displacement Plan have been female. At present, the evidence indicated that the Administration's primary motivation was racial discrimination. However, this disparate effect on Black female employees suggests that evidence may arise over the course of this case that indicate gender discrimination as well. If such evidence arises, Plaintiff reserves her right to seek leave to add a gender-discrimination claim under Title VII as well.
[17] See Exhibit 6, EEOC Right to Sue Letter dated June 18, 2020; see also Exhibit 2, Plaintiff's Request to Appeal to HCC Board (presented to the HCC Board on June 3, 2020). The Board did not grant the appeal.

83.     The conduct of HCC and the individual Defendants acting in their individual capacities and under color of law violated Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2, et seq., in that Defendants discriminated against Plaintiff because of her race. Defendants have engaged in a system and custom of policies, practices and pattern of conduct under color of law that has damaged Plaintiff and the Plaintiff Class with discriminatory and retaliatory conduct, and a pattern or practice of intentional discrimination against members of protected classes, in violation of the foregoing laws. As a part of this scheme, Defendants regularly create pretextual justifications for their specific actions. This scheme both constitutes disparate treatment and creates a disparate impact on members of the Plaintiff Class.

84.     Plaintiff was also retaliated against in violation of Title VII. Defendants' retaliation against Plaintiff was part of a broad custom, policy, pattern, and practice of retaliation against Black employees. Specifically, Plaintiff engaged in a protected activity by complaining about the exclusion of Blacks from grant meetings, and in complaining about the systematic targeting and investigation of Black employees. The Defendants acted adversely against Plaintiff under color of law, and the adverse action was taken because of Plaintiff's protected activity. A reasonable employee would have found the challenged action materially adverse and the challenged action would have dissuaded a reasonable worker from engaging in the protected activity.

85.     As a result of her protected status and activities, Plaintiff suffered an adverse employment action, including but not limited to being investigated, harassed, and ultimately, constructively discharged from her employment. The working conditions were so intolerable and hostile that Plaintiff could not reasonably be expected to endure the working environment and situation, thereby forcing her to resign.

86.     Other employees who were similarly situated—but not a member of Plaintiff's protected classes—were not subjected to the same adverse employment actions described above, including but not limited to harassment and pretextual investigation.  Moreover, discharged Black employees, like Plaintiff, were replaced by less qualified White and Hispanic employees.

87.     Defendants' discriminatory and retaliatory conduct has caused Plaintiff damages in the form of lost wages and benefits, stigma damages, mental anguish, emotional distress, humiliation, inconvenience, loss of enjoyment of life and other pecuniary and non-pecuniary compensatory damages she has suffered in the past and, in reasonable probability, will suffer in the future, all in an amount in excess of $1,000,000.00. Reinstatement is not feasible and has already been rejected by Defendants.  Defendants' conduct was committed with intentionality, malice, consciousness, and/or reckless indifference to Plaintiff's rights and, as such, justifies an award of punitive damages which Plaintiff now seeks on her behalf and the Plaintiff Class members.

**VIOLATION OF CHAPTER 21 OF THE TEXAS LABOR CODE**

88.     This claim is brought on behalf of Plaintiff in her individual capacity and as a representative of the Plaintiff Class.

89.     Defendant HCC is an employer as defined in Chapter 21 of the Texas Labor Code. At all times material to the claims asserted herein, this Defendant employed more than 500 employees.  Defendant was aware that Plaintiff was a member of a protected racial class.

90.     Plaintiff has timely and fully complied with prerequisites for administrative exhaustion required under Chapter 21.  Thus, all conditions precedent to bring this cause of action have been performed or have otherwise been satisfied.[18]

---

[18] See Exhibit 6, EEOC Right to Sue Letter dated June 18, 2020; *see also* Exhibit 2, Plaintiff's Request to Appeal to HCC Board (presented to the HCC Board on June 3, 2020).  The Board did not grant the appeal.

91.     The conduct of HCC and the individual Defendants acting in their individual capacities and under color of law violated Chapter 21 of the Texas Labor Code in that Defendants discriminated against Plaintiff because of her race.  Defendants have engaged in a system and custom of policies, practices and pattern of conduct under color of law that has damaged Plaintiff and the Plaintiff Class with discriminatory and retaliatory conduct, and a pattern or practice of intentional discrimination against members of protected classes, in violation of the foregoing laws. As a part of this scheme, Defendants regularly create pretextual justifications for their specific actions.  This scheme both constitutes disparate treatment and creates a disparate impact on members of the Plaintiff Class.

92.     Plaintiff was also retaliated against in violation of Chapter 21.  Defendants' retaliation against Plaintiff was part of a broad custom, policy, pattern, and practice of retaliation against Black employees.  Specifically, Plaintiff engaged in a protected activity by complaining about the exclusion of Blacks from grant meetings, despite their job descriptions clearly covering the subject matter of those meeting.  The Defendants acted adversely against Plaintiff under color of law due to her protected activity.  A reasonable employee would have found the challenged action materially adverse and the challenged action would have dissuaded a reasonable worker from engaging in the protected activity.

93.     As a result of her protected status and activities, Plaintiff suffered an adverse employment action, including but not limited to being investigated, harassed, and ultimately, constructively discharged from her employment.  The working conditions were so intolerable and hostile that Plaintiff could not reasonably be expected to endure the working environment and situation, thereby forcing her to resign.

94.     Other employees who were similarly situated—but not a member of Plaintiff's protected classes—were not subjected to the same adverse employment actions described above, including but not limited to harassment and pretextual investigation.  Moreover, discharged Black employees, like Plaintiff, were replaced by less qualified White and Hispanic employees.

95.     Defendants' discriminatory and retaliatory conduct has caused Plaintiff damages in the form of lost wages and benefits, stigma damages, mental anguish, emotional distress, humiliation, inconvenience, loss of enjoyment of life and other pecuniary and non-pecuniary compensatory damages she has suffered in the past and, in reasonable probability, will suffer in the future, all in an amount in excess of $1,000,000.00. Reinstatement is not feasible and has already been rejected by Defendants.  Defendants' conduct was committed with intentionality, malice, consciousness, and/or reckless indifference to Plaintiff's rights and, as such, justifies an award of punitive damages which Plaintiff now seeks on her behalf and the Plaintiff Class members.

**VIOLATION OF PLAINTIFF'S FIRST AMENDMENT RIGHT TO PETITION GOVERNMENT WHICH IS ENFORCEABLE UNDER 42 U.S.C. § 1983.**

96.     This claim is brought on behalf of Plaintiff in her individual capacity.

97.     Plaintiff alleges the Defendants retaliated against her for exercising her non-job related right to petition government to report suspected illegal conduct undertaken by Defendants under color of law.  The First Amendment guarantees to Plaintiff the right to petition government in addition to a right of free speech.  Within hours of the Defendants learning that the OIG had been petitioned by Plaintiff and that it was going to investigate Plaintiff's complaint about misused grant funds, the Defendants instructed Plaintiff not to return to work which is clear evidence of retaliatory conduct against Plaintiff for her exercise of her First Amendment right.  Pursuant to 42

U.S.C. § 1983, Plaintiff seeks recovery of her damages, compensatory and punitive, which were caused by such abridgment of her rights.

## TEXAS WHISTLEBLOWER CLAIM

98.     This claim is brought on behalf of Plaintiff in her individual capacity.

99.     The Texas Whistleblower Act ("TWA"), *see* Tex. Gov't Code Section 554.001, *et seq.*, prohibits a "local governmental entity" from retaliating against an employee for reporting a violation of law by the employer.  Tex. Gov't Code § 554.002(a).  The TWA prohibits a public institution like HCC from "suspending" or terminating the employment of or taking any other adverse personnel action against a public employee who in good faith reports a violation of law to a law enforcement authority.   In this case, HCC, Maldonado, Anderson, and May, acting in their official and individual capacities, violated the TWA with regard to Plaintiff.

100.     After Plaintiff reported HCC's unlawful use of federal funds, HCC and the individual Defendants immediately retracted an earlier conditional request for Plaintiff to return to work and told her to stay on leave of absence.  Such was an adverse personnel action which ultimately lead to Plaintiff's constructive discharge.  Having already experienced Defendants' false claim that she had created a hostile workplace, and now being told not to return to work for *reporting* questionable grant conduct to the OIG, Plaintiff objectively and reasonably concluded she was being retaliated against in violation of the TWA.  Plaintiff, therefore, seeks damages, compensatory and punitive, as allowed under the TWA.

101.     The TWA expressly waives HCC's and its officials' immunity from suit and liability for conduct actionable under that statute.  Tex. Gov't Code § 554.0035.

## VII.
### JURY DEMAND

102.     Plaintiff demands a jury trial.

## VIII.
### ATTORNEYS' FEES

103.    Defendants' actions and conduct as described herein and the resulting damages and losses to Plaintiff has necessitated Plaintiff retaining the services of lawyers and law firms listed below to investigate, initiate, and prosecute the claims in this lawsuit.  Plaintiff seeks recovery of reasonable and necessary attorneys' fees under 42 U.S.C. § 1988, and any other applicable law or statute, as well as expenses, court costs, and expert witness fees.

### PRAYER AND DAMAGES

As a direct and proximate result of the Defendants' collective conduct, Plaintiff seeks judgment against all Defendants for damages suffered in the following particulars:

- Lost wages in the past and future;

- Lost health insurance and related benefits in the past and future;

- Loss of pension and/or retirement benefits;

- Emotional suffering in the past and future;

- Stigma damages;

- Mental anguish damages;

- Plaintiff also seeks punitive damages;

- Attorneys' fees, costs and expenses;

- All equitable, injunctive, and declaratory relief to the extent allowed in law or at equity to which Plaintiff and the Plaintiff Class may show themselves justly entitled;

- Plaintiff also seeks certification of a Class as identified above, or as the evidence may support;

- Plaintiff asserts her individual compensatory damages are between $1,000,000.00 and $2,500,000.00; and punitive damages should exceed $2,500,000.00.

- Additionally, if a class is certified, Plaintiff believes there will be more than 100 members of the class and that the class members collective damages, compensatory and punitive, will exceed $100,000,000.00, inclusive of costs, fees, and punitive damages.

- Finally, Plaintiff seeks injunctive relief against the Defendants to enjoin their racial discriminatory practices against Black employees at HCC. HCC must be permanently enjoined from discriminating against Black candidates and employees in hiring, disciplining, and termination decisions.

Respectfully submitted,

**THE HALL LAW GROUP, PLLC**

*/s/ Benjamin L. Hall, III*
**Benjamin L. Hall, III**
State Bar No. 08743745
Federal Bar No. 8787
bhall@bhalllawfirm.com
**William L. Van Fleet II**
State Bar No. 20494750
Federal Bar No. 3670
bvfleet@comcast.net
THE HALL LAW FIRM
530 Lovett Blvd.
Houston, Texas 77006
Telephone: (713) 942-9600
Facsimile: (713) 942-9566

-AND-

**BAKER BOTTS, LLP**

**Thomas R. Phillips**
State Bar No. 00000022
S.D. TX No. 5765
tom.phillips@bakerbotts.com
**Travis L. Gray**
State Bar No. 24101824
S.D. TX No. 3184594
travis.gray@bakerbotts.com

**Katherine A. Brooker**
State Bar No. 24075772
katherine.brooker@bakerbotts.com
98 San Jacinto Blvd.
Austin, Texas 78701
(512) 322-2500

-AND-

**THE HITTNER GROUP, PLLC**

**George J. Hittner**
State Bar No. 24038959
S.D. TX No. 431901
george.hittner@thehittnergroup.com
P.O. Box 541189
Houston, Texas 77254
Phone: (713) 505-1003

-AND-

**THE VILLACORTA LAW FIRM, P.C.**

**Adrian V. Villacorta**
State Bar No. 24003111
530 Lovett Blvd.
Houston, Texas 77057
Telephone: (832) 991-8864
Facsimile: (832) 201-7469
avillacorta@avvlaw.com

-AND-

**JIMMY ARDOIN & ASSOCIATES, PLLC**

**James Ardoin**
State Bar No. 24045420
S.D. TX No. 571281
4900 Fournace Place, Suite 550
Houston, Texas 77401
Phone: (713) 574-8900
Toll Free: (888) 701-8509
Email: jimmy@jimmyardoinlaw.com

**ATTORNEYS FOR PLAINTIFFS**